## Federal District Court
## District of New Hampshire

Kevin Hokenstrom, petitioner

v

Case # 1-14-fp-557

N.H. Dept. of Corrections, respondent

2014 DEC 15 P 12: 10

## Petition for
## 42 USCS §1983

Now comes petitioner Kevin Hokenstrom, pro se, an inmate at the N.H. Department of Corrections in Berlin, serving a 22 year sentence that began February 2001. Petitioner respectfully submits to this honorable Court evidence of violations to his civil and Constitutional Rights by the N.H. DOC. These violations include; the Eighth Amendment prohibition of cruel and unusual punishment, the Fourteenth Amendment right to due process and 42 USCS §12101 et.seq. the Americans With Disabilities Act. These violations began in 2001 and have continued through 2014. Petitioner seeks restitution for lost wages, expences incurred, court costs and punitive damages.

Table of Contents:

• Responsibility                          p. 3
• Disabilities described                  p. 3
• Scope                                    p. 4
• Argument                                 p. 6
• Appendices:
  • Appendix A1-A3  Recommendations by health
     care and prosthetic professionals.
  • Appendix B1-B3  Chronological listing of
     footwear and prosthesis delays.
  • Appendix C1-C3  Chronological bullet-form
     synopsis of Appendix D communications.
  • Appendix D1-D55  Inmate Request Slips
     (IRS) to DOC staff from 2003 - 2014

## Responsibility:

Petitioner holds responsible for the hereafter described civil rights violations, the following DOC personnel, both past and present, in their personal and official capacities:
- the Office of the Comissioner William Wrenn (present),
- the Director of Medical and Forensic Services Robert MacLeod (past), Helen Hanks (present)
- Berlin Medical Services Coordinator Denise Raucourt (past), Ryan Landry (present)
- DOC Physical Therapist Bernie Campbell

## Disabilities description:

Petitioner is a 58 year old male with multiple congenital defects from the anomalous development of the skeletal system in utero. The birth defects include missing his left hand and having an extremely short right leg. The bone of the right leg is approximately 8 inches long starting at the hip and attaching directly to the ankle of the foot. The right foot is normal in appearance, but only two-thirds the size of the left foot.

Petitioner's pelvis is deformed with the right hip being 1½ inches lower than the left and that lower right hip (ball and socket) being only ⅔ the size of the left hip. There is also a deformation of petitioner's left foot where the front half curves to the right, rendering the foot extremely wide. In 2007 a neuroma was diagnosed in the second IM space of the left foot. As petitioner is missing an extremity on opposite sides of his body, he is classified as severly disabled under Federal guidelines.

Scope:

Petitioner will present evidence of multiple rights violations by the DOC to include:
1) the refusal to provide petitioner the use of his above-knee prosthetic leg for the first 26 months of his incarceration.
2) the cruel and unusual punishment inflicted through their deliberate indifference to petitioner's pain and suffering experienced by having to walk daily on an ill fitting and/or broken prosthetic leg for weeks to months at a time. This occurred multiple times over the last 10 years.

4

3) the DOC's deliberate indifference to petitioner's pain and suffering occurring from weeks of physical rehabilitation resulting from extended periods of time (weeks/months) without the use of the prosthetic leg when it required servicing. This occurred multiple times over the last 10 years.

4) the DOC's discriminatory decision to cease providing shoes necessitated by petitioner's disabilities. From August 2004 until August 2013 the DOC provided the shoes required to meet those needs. However, in September 2013 the DOC reversed their position, telling petitioner to buy his own shoes.

5) the DOC's deliberate indifference as to whether petitioner had use of his prostheses or not, for extended periods of time, has resulted in discrimination by being excluded from:

   a) participation in activities available to non-disabled inmates in the outdoor yard and indoor gymnasium.

   b) consideration for hiring for several coveted inmate job opportunities.

   c) having the choice of living in the more

desirable top floor living units in the facility.

## Arguement:

Petitioner respectfully submits this 42 USCS §1983 to this honorable Court for remedy and/or restitution from the deprivation of his civil rights and privileges secured by the Constitution and Federal Laws violated under the color of the laws, policies and practices of the State of N.H.

Petitioner asserts that personnel of the N.H. Department of Corrections (DOC) have routinely violated his rights under the Eighth Amendment prohibition of cruel and unusual punishment, the Fourteenth Amendment to due process, as well as 42 USCS §12101 et. seq. Americans with Disabilities Act (ADA).

The violations began at the start of his incarceration with the DOC refusing him the use of his prosthetic leg for over 2 years, then when petitioner finally got his leg and servicing of any kind was needed, he was without the leg for weeks to months

at a time. These extended and unnecessary periods of time to service and return his leg have been occuring regularly for the last 10 years, reflecting a pattern of deliberate indifference as to whether petitioner had use of his prosthetic leg or not, as well as the pain and suffering resulting from these deprivations.

This apathy has been compounded by new restrictions imposed by policies and procedures focusing only on cost savings and on convenience. In the 30 years preceeding his incarceration, petitioner was only without his prosthetic leg once, for 2 days. All servicing issues were done in minutes to a couple hours with an appointment made within a few days of calling the prosthetic provider

The ADA §12102 has defined the word "disability" to mean: "a physical or mental impairment that substantially limits one or more major life activities of an individual." These major life activities as they apply to petitioner are; caring for oneself, performing manual tasks, walking, standing, lifting, bending and working. For example, when Med. Services

7

deprives him of his prosthetic leg for weeks to months at a time, even simple life activities become difficult, painful or impossible on crutches with one hand: standing for 30 minutes in the canteen line (prison store), then carrying a bulky bag of purchases back to the unit; filling a mop bucket and cleaning the cell; carrying multiple books to and from the library; participating in any outdoor/indoor recreational activities; etc. While some fellow inmates may be helpful at times, the basic tenet in prison is that nothing comes free.

Then there are the serious disruptions to the major life activities of working and exercising to maintain health. While Mr. Pellitier, who runs the Berlin kitchen has an exemplary record of giving disabled inmates a chance to work and has been very patient in holding petitioner's job twice for several weeks, can't hold a job open for months. Med. Services latest debacle resulted in 5 months without his prostheses, costing him his job. Even though petioner was hired back a few weeks after receipt of the prosthesis, there is still the issue of lost wages.

8

The ongoing pattern of extended time without his prosthesis has resulted in inevitable forms of discrimination, in that:

1) petitioner is not eligible for consideration for coveted job positions he would otherwise be qualified for, such as the higher paying 7 day per week positions of cook, lead line worker, etc. These are critical need jobs that can't be filled by someone frequently out for weeks/months at a time. Therefore, petitioner is only able to work in group environments (dish crew, cleaning crew) where others on the crew can cover his absence.

2) Without his prosthesis and reliant on crutches, petitioner is not allowed to live in the preferred top floor housings units of the facility. Fire codes prohibit the use of an elevator as the only safe egress from the living units.

In addition to the apathy regarding his prosthesis, the DOC is discriminating against petitioner by not providing him footwear to meet the needs of his disabilities. Petitioner is unable to wear the boots issued to all other inmates for the following reasons:

1) the prosthesis geometry was designed

for use with sneakers as the bottom of
the shoe needs to be flat, i.e.: no raised
heel that would snag on any irregularities
of the ground when the leg swings forward.
The shoes must also be lightweight, as they
are swinging at the end of a prosthesis
weighing 10 pounds.

Appendix A1 shows the recommendation
of such a shoe by the prosthetic provider
New England Brace (NEBCO)

2) The deformity of petitioner's left foot
requires a shoe width of 4E. The State
issued boots are only a D width. The DOC's
contracted podiatrist Dr. Bedard-Ryan made
the 4E width orthotic insert to provide
correct arch support to relieve a painful
neuroma. She has instructed petitioner
to wear shoes at least 4E in width. The
DOC in-house physician Dr. Englander
also expressely recommends 4E width flat-
sole sneaker shoes. See Appendix A2.

In an 18 month battle petitioner compelled
the DOC to meet their obligations to provide
the shoes he needed from 2004 to 2012.
However, in 2013 they reversed their decision
telling petitioner to buy his own shoes.

As the shoes are necessary to accomodate petitioner's disabilities, it is discriminatory to tell him to buy his own shoes while issuing shoes to non-disabled inmates.

The DOC's decision reversal is due to their changing of the Policy and Procedure Directives (PPD) to save money by shedding the obligation to provide footwear necessitated by inmates with disabilities. When the DOC began purchasing petitioner's footwear in 2004, it was only after a 10 month long battle where he asserted his right based on Med. Services PPD 6.16 "Special Shoes/Boots:

The DOC will not pay for footwear except in the following cases: severe foot deformities causing documentable problems regarding pain and function."

As documented in Appendix D3-D14 petitioner made multiple requests for footwear necessary to safely walk with his prosthesis. Physical Therapist Bernie Campbell, Nurse Coordinator Denise Rancourt and Dir. Med Services Robert MacLeod all made groundless denials to his requests. Petitioner was even told in June 2004 by P.T. Campbell that Dir. MacLeod would stop him from receiving his leg unless

he bought his own shoes. When petitioner
wrote to Dir. MacLeod on June 23, 2004 (Appendix
D10) asking him to confirm P.T. Campbell's
assertions, the Director evaded the question,
but did authorize purchase of the shoes. Petitioner
was never able to determine whether P.T.
Campbell or Dir. MacLeod was the source
of the extortion attempt. However, when
petitioner wrote to Med. Services that July
to confirm the shoe purchase, Nurse
Coordinator Denise Rancourt refused the
purchase. The final re-approval by Dir.
MacLeod didn't occur until August 2004.
Med. Services provided the shoes until 2012.

   In December 2013 petitioner wrote to the
new Director Medical Services Helen Hanks
explaining that the shoes are necessary for
safe ambulation with his prosthetic leg and
preventing severe pain from the left foot
neuroma. A Dr. Fedder replied saying that
while they are medically recommended, they
are not medically necessary. He is telling
petitioner he does not have a right to walk.
   The reason the DOC believed they could
now justify denying petitioner the shoes
he needs is that they had recently eliminated

the "Special Shoes/Boots" section from
the Med. Services PPD. Petitioner asserts
this is a direct violation of the ADA
§12182 (b)(2)(A)(i) - "the imposition... of
elegibility criteria. (ii) a failure to make
reasonable modifications in policies, practices
or procedures. (iii) a failure to take such
steps as necessary." The DOC is not
simply failing to make modifications to
accomodate disabled inmates, they are
actively modifying policies & procedures in
order to avoid having to make accomodations.
    The DOC similarly rewrote the Med.
Services PPD regarding replacement of prosthetic
devices. In 2004 the Medical PPD stated
that the DOC would only replace prosthetic devices
with what the inmate came in with. The DOC
rewrote this PPD around 2010 to read: "Practioners
will approve the least costly prosthetic device that
will accomplish restoration of the basic function
determined to be necessary."
    A prosthesis manufactured under these guidelines
would be substantially heavier and lack knee
control functions for safe ambulation. Such a
prosthesis would greatly restrict the duration
and type of activity available to a disabled

13

inmate.

This kind of cost justified discrimination is rejected by the Eleventh Circuit in Zimring v Olmstead 138 F.3d 893 when the Court stated:

"The ADA §12101 et.seq. does not permit the State to justify it's discriminatory treatment of individuals with disabilities on the grounds that providing non-discriminatory treatment will require additional expenditures of State funds."

Similarly, the Eleventh Circuit also determined in Harris v Thigpen 941 F.2d 1945 that: "The fact that the care may be expensive does not exclude prison officials from providing it."

In 2008 petitioner's 14 year old prosthesis required replacement. Since the obsolete exo-skeletal design was causing problems with petitioner's aging hip due to it's inherent excessive weight and since lighter endoskeletal designs had been standard technology for 10 years, the DOC's Dr. Eppolito wrote a prescription for manufacture of an endoskeletal prosthesis with the same knee stability features as his obsolete prosthesis. See Appendix A3. At the initial NEBCO consult, the prosthetist, John Emery, agreed with Dr. Eppolito's recommendation,

14

particularly since the exoskeletal Mauch knee unit was going out of production soon. However, the DOC ignored the recommendations of both professionals and ordered another obsolete exoskeletal prosthesis manufactured. The few dollars the DOC saved resulted in a significant restriction of petitioners daily walking exercise for the next 5 years due to the hip pain caused by a needlessly heavy prosthesis.

To provide grounds for an ADA claim the First Circuit has established a 3-prong test to be met as stated in Race v Toledo-Davila 291 F.3d 857: "To succeed with a claim under Title II of the ADA, a plaintiff must establish: 1) He is a qualified individual with a disability, 2) he was either excluded from participation in or denied the benefits of some public entities' services, programs or activities or was otherwise discriminated against, and 3) that such exclusion, denial of benefits or discrimination was by reason of the plaintiffs disabilities." Petitioner believes he has amply met the Court's requirements for the ADA part of his claim.

Petitioner next asserts that Med. Services' apathy or deliberate indifference to timely

15

servicing of his prosthesis is considered cruel and unusual punishment as the delays directly cause repeated pain and suffering. The prohibition of cruel and unusual punishment as guaranteed by the Constitution's Eighth Amendment, applies to the State through the due process clause of the Fourteenth Amendment.

Petitioner contends that the DOC's repeated refusal to expedite the process involved in servicing his prosthesis is an Eighth Amendment violation. This cruel and unusual punishment is manifested in 2 ways:

a) the pain and suffering of having to "hobble around" on a dysfunctioning or ill-fitting prostheses for weeks to months. The most frequent servicing needed, every 18 months or so, involves removing the Mauch hydraulic knee unit and shipping it out for rebuilding. What petitioner can do on the street with one phone call and 2-3 days later a 2 hour appointment takes months for the DOC to accomplish. The following outlines the best case scenario to have the knee unit rebuilt.

Petitioner sends an IRS to Med. Services when he begins to feel the prosthesis acting erratically, asking for an appointment with provider to

16

have unit rebuilt. It takes 1 - 2 weeks for Med. Services to make an appointment. Petitioner is then transported to provider 3-4 weeks later. The knee unit has failed by now, rendering the knee locked-up. This means the leg no longer bends, but there is about 1/2 inch of slack, resulting in a jolting gait that sends a sharp vibration to the hip with each step. Next, at the provider's appointment, the prosthetist must examine the prosthesis and then send an estimate for repairs back to the DOC for approval. This approval takes 2-4 weeks, after which another appointment is made and 3-4 weeks later the prosthesis is left with the provider to swap-out a "loaner" hydraulic unit for use while his is being rebuilt. The prosthesis is then returned to Med. Services in 1-2 weeks.

   This best case scenario highlights that petitioner is hobbling around on a painfully dysfunctioning prosthesis for a couple of months, then without the prosthesis for at least 1-2 weeks. However, in both 2009 and 2011 petitioner was forced to hobble around for 5 months each time before the unit was rebuilt. By the end of each day,

just doing necessary walking, petitioner's
hip hurt so badly the pain continually
disrupted his sleep all night.
b) The second manner in which pain and
suffering is inflicted on petitioner is after
extended periods of time without his prosthesis.
As petitioner is 58 years old he has found that
his body undergoes alarmingly rapid changes
when deprived of his prosthesis for a month
or longer. All the muscles involved with
walking or bending deteriorate quickly.
All of the callouses and toughened skin areas
clamped into the socket soften and disappear.
This means that every time he is deprived
of his leg for a month or more he has to
experience the painful rehabilitation of
rebuilding severely weakened muscles in the
entire lower half of his body and suffer the
abrasions, blistering and desensitizing pressure
points to recondition the limb to the socket.
Less painful but still humiliating are the
falls that occur while muscles and balance
are gradually regained. It takes about
6 weeks to rebuild muscles and transform
the socketed limb to a state of normalcy.
Appendix D documents the delays over the

18

Last 10 years, highlighting Med. Services indifference to the seriousness of petitioner's medical need to have a properly functioning and fitting prosthesis without excessive delays. The N.J. District Court in Taylor V Plousis 101 F.Supp2d 255 determined: "A medical need will be considered serious where delay in treatment results in the unnecessary and wanton infliction of pain. Moreover, a medical condition which threatens a plaintiffs ability to walk, even on a non-permanent basis, falls within the ambit of a serious medical need." The same Court also stated: "Intentional delay in providing leg prosthesis would constitute deliberate indifference" Taylor (supra).

While the DOC may argue they are not "intentionally" delaying the process, they cannot deny that they intentionally refuse to expedite the process to reduce delays. In fact in 2011 they added the step of the prosthetic provider having to examine the prostheses and submit an estimate for approval before any work can be done. This step alone doubled the time that petitioner has to walk on a dysfunctioning prosthesis

or no prosthesis at all. Appendix D39 —
D39e is a 5 page IRS sent to the Dir
Med. Services detailing the problems causing
excessive delays in servicing his prosthesis
and offering proactive solutions. The
response was a polite "Thank you for
your suggestions.", but nothing changed.
      The N.J. District Court further determined
in Taylor (supra) that: "Deliberate indifference
exists where officials delay necessary
treatment for non-medical reasons or where
prison officials erect arbitrary and burdensome
procedures that result in a significant
delay in such treatment."
      One of petitioner's suggestions to help
expedite the process is to have DOC
maintence do minor or "preventative
maintence" on the prosthesis, as he has done
all his adult life. The Med. Services response
was an emphatic "no".
      The DOC has shown a deliberate intent
to maintain the current process involving
excessive delays in servicing and returning
petitioners prosthesis. They are therefore
deliberately indifferent to the pain and
suffering the delays cause. The District

Court of the First Circuit finds such deliberate
intent to violate the Eighth Amendment as
stated in Ferola v Moran 622 F.Supp 814:
"The Eighth Amendment requires the government
to provide medical care for prisoners, and
deliberate indifference to serious medical
needs of prisoners constitutes unnecessary
and wanton infliction of pain, forbidden by
the Eighth Amendment. The critical factor
is that the indifference be not merely
inadvertant or negligent, but deliberate, for
it is only such deliberate indifference that
can offend evolving standards of decency in
violation of the Eighth Amendment."
   The First Circuit in Kiman v N.H. DOC
301 F.3d 13 expressed their opinion that
disabled inmates rights against cruel and
unusual punishment, as well as discrimination,
are protected by Title II of the ADA: "Title
II of the ADA protects the Constitutional Rights
of the disabled and specifically the rights of
disabled prison inmates against discrimination
and against cruel and unusual punishment."
   The District Court Second District (First
Circuit) finds the DOC's haphazard treatment
reaches the level of deliberate indifference

21

as stated in Soneeya v Spencer 851
F.Supp 2d 228 : "Deliberate indifference may
be found even in the absence of any
sinister motive or purpose to do harm.
Rather, a pattern of delays, poor explanations,
missteps, changes in position and rigidities,
may be used to infer deliberate indifference
on the part of the DOC."

    Therefore, in light of the aforegoing,
petitioner contends he has presented
sufficient evidence of the constitutional
and Federal rights violated by the N.H. DOC.
In Hafer v Melo 502 US 21 the U.S.
Supreme Court determined: "In suit for
damages brought under §1983 against state
official in official capacity, for liability to
be established, governmental entities' policies
or customs must have played a part in
violation of Federal law."

    Petitioner contends the aforegoing violations
subject the DOC to both compensatory as
well as punitive damages. The N.H. Supreme
Court provides guidelines for compensatory
damages in Porter v City of Manchester 151 NH
30 : "The usual rule of compensatory damages

in tort cases requires that the person wronged receive a sum of money that will restore the person as nearly as possible to the position he or she would have been in if the wrong had not been committed."

Petitioner seeks compensatory damages for the lost wages he suffered in the 5 months he was deprived of his prosthesis during the summer of 2014. While petitioner lost his prosthesis April 15th it was assumed to be the usual 4-6 weeks before return of his prosthesis, so Mr Pelliter kept his job open. However, at the end of May he discovered the extensive delay due to the remanufacture of the lower half of the prosthesis would result in a delay until at least the end of the summer. So Mr Pelliter had to let petitioner go with the assurance he would be rehired upon receipt of his prosthesis. As such, Mr Pelliter paid him from April 15th until June 1st. At that point petitioner's pay went from $3.per day, 6 days per week ($18 per week) down to .85¢ per day, 5 days per week ($4.25 per week). Petitioner resumed working in the kitchen October 1st.

Therefore, petitioner seeks compensatory

23

damages for 17 weeks of lost wages. The difference between the no job rate of $4.25 per week and the kitchen rate of $18. per week is $13.75. That difference times 17 weeks comes to $233.75. In addition, petitioner must work the first 7 months at $2. per day before returning to the $3 per day he was earning. As the N.H. Supreme Court determined compensatory damages need to "restore the person as nearly as possible to the position he or she would have been in...", petitioner asserts he is entitled to that $1. per day, 6 days per week for the 30 weeks until he is back to his $3. per day. This comes to $180. Combining lost wages with lost future wages comes to $413.75

In June 2014 petitioner sought these wages from the DOC when he wrote to Dir Med Services Helen Hanks and Commissioner Wrenn explaining that the DOC was negligent, therefore at fault for the extensive delay resulting in the job loss. He explained that the DOC was negligent as they were informed by NEBCO in 2008 when they ignored recommendations and ordered an obsolete exoskeletal prosthesis with a knee unit being discontinued. See Appendix

D54 - D546 and **D55.**

Following their "lowest cost" over patient health paradigm, the DOC once again ignored professional recommendations and ordered another obsolete exoskeletal prosthesis, but as the Mauch knee unit was long discontinued, they substituted a far inferior knee unit lacking the stability functions petitioner has relied on for 30 years. When petitioner went to the new prosthetics provider Capitol O&P and discovered that the endoskeletal recommendation had been rejected for an obsolete design he could not walk safely in, both petitioner and Capitol O&P agreed it was too unstable and rejected the design.

Petitioner instructed Capitol O&P to resubmit the endoskeletal design and inform petitioner if it was not approved so he could file an injunction. The DOC finally complied, but the second approval process and second manufacture process not only cost petitioner his job, but likely cost the DOC far more money than if they had simply complied with the professionals who had recommended the endoskeletal prosthesis back in 2008. A Mr Kench of the

25

Commissioner's Office refused to compensate
petitioner for any lost wages.

Petitioner next seeks the restitution of
$63.15 for work shoes he was forced to
purchase in 2013. As 2 doctors have instructed
petitioner to wear alternative shoes to the
ones DOC issues all non-disabled inmates,
does not mean he has to purchase his own.
Petitioner further requests this honorable
Court issue a mandate that the DOC
reimburse him for all future shoe purchases
at the same frequency of replacement as
they replace shoes issued to all other inmates.

Lastly, petitioner seeks punitive damages
in the amount of $20,000. The U.S. Supreme
Court in Smith v Wade 461 US 30 held that
"punitive damages in an action under §1983 are
available when a defendants' conduct is shown
to be compelled by or when it involves callous
indifference to the federally protected
rights of others."

The N.H. Supreme Court similarly determined
the availability of punitive damages in Porter
v City of Manchester 151 NH 30: "§1983,
which is derived from the Civil Rights Act of
1871 "was intended to create a species of

26

tort liability in favor of persons deprived of federally secured rights" (Smith v Wade 461 US 30). It is well established that "a jury is permitted to access punitive damages in an action under §1983 when the defendants' conduct... involves reckless or callous indifference to the federally protected rights of others." It is likewise generally established that individual public officers are liable for punitive damages for their misconduct on the same basis as other individual defendants."

Petitioner intends to use the vast majority of the $20,000. to purchase the manufacture of a second prosthesis. Additionally, he will have the socket of the current prosthesis replaced using newer and lighter materials than "lowest cost" provides for. The current socket was made in 2008. Only the lower half of the prosthesis was replaced in 2014. It is important that both sockets be identical and the only way to ensure that is manufacturing them at the same time.

Petitioner asserts that having two prostheses is the only way his civil rights will be guaranteed. The DOC has repeatedly

refused to modify any policy or procedure to expedite the servicing process, in fact they instituted cost saving policy which significantly lengthened the process. The DOC has repeatedly refused to purchase a second hydraulic unit and refuses to allow Maintenance Services to perform any servicing. The DOC has also refused petitioner's suggestion to have the prosthetics provider come into the facility.

As such the only alternative available to end the discriminatory deprivations of his prosthesis and the resultant pain and suffering, is to have two identical prostheses. When one needs servicing, petitioner wears the second, thus allowing the DOC the months required to service the dysfunctioning one.

Lastly, petitioner seeks reimbursement for costs in seeking justice for these civil rights violations. At this time petitioner seeks $TBD in photocopy costs. Further expenses of postage and additional photocopies are expected. Court costs of $350.00 for filing fee are expected. The percentage owed petitioner and remainder owed the Court, as well as legal fees, will be determined at judgement.

Therefore, in light of the foregoing evidence

of the pattern of civil and constitutional
Rights violations, petitioner respectfully
requests this Honorable Court schedule
this action for jury trial.

Respectfully submitted

12/09/14

Kevin Hokenstrom

date

Kevin Hokenstrom

NCF 74448

138 East Milan Rd

Berlin, N.H. 03570

29

Dear Court Clerk;

U.S. DISTRICT COURT
DISTRICT OF N.H
FILED        12/09/14

2014 DEC 15  P 12:10

Please find enclosed my petition for NH USCS 1983 enclosed. As I don't know what I'm doing, I hope the petition is procedurally correct enough for filing.

In a seperate mailing I am also sending you a Motion to Proceed In Forma Pauperis and Motion for Court Appointment of Counsel. According to the court rules, the court will assess the initial filing fee of 20% of the balance in the inmate account for the last 6 months. According to my calculator, this comes to $37.99. Do I send a request to Inmate Accounts now, or do I wait for a decision on whether the Motion for 1983 is determined to be procedurally correct?

Thank you for any assistance you may provide.

Regards,
Kevin Hokenstrom

Kevin Hokenstrom
NCF 74448
138 East Milan Rd
Berlin, N.H. 03570